Case No. 22-7127. Peter Toren, executor of the estate of David Toren, abelants, v. Federal Republic of Germany. Mr. Orsek, for the abelants. Mr. Dirks, for the epaulets. Good morning, counsel. Mr. Orsek, please proceed when you're ready. Good morning. Thank you, Your Honor. May it please the Court, I'm Gary Orsek, for Plaintiff Peter Toren. The expropriation exception in the Foreign Sovereign Immunities Act defers jurisdiction over a claim that property was taken in violation of international law. In Philip, the Supreme Court held that the exception's reference to international law means the international law of expropriation or property, not human rights law. And it therefore incorporates the domestic takings rule. And because the plaintiffs in that case had as their principal theory of jurisdiction that the taking of their property was a genocide, the Supreme Court reversed and remanded. But the Supreme Court directed the district court to consider on remand an alternative theory of jurisdiction, which was that the plaintiff's claim was not barred by the domestic takings rule because the plaintiffs, despite having been born in Germany and living in Frankfurt at the time of the taking, nevertheless were not German nationals at the time of the taking. In light of Philip, Judge Leon dismissed our case for lack of jurisdiction. But that ruling was an error, and Germany's efforts to prop up the ruling are unpersuasive. Judge Leon dismissed the case, first, by mischaracterizing the essential theory of jurisdiction that we pleaded, and second, by misreading Philip. First, as he saw it, and as he wrote, the thrust of our theory of jurisdiction was that Germany, during the course of a genocidal course of conduct, sufficiently persecuted its Jewish nationals so as to render them stateless. And second, he held that the Supreme Court in Philip, quote, made clear that a claim like that one is not encompassed within the expropriation exception. Mr. Lorsak, say, assume that I agree with your argument that Mr. Friedman was stateless. What is your best affirmative evidence that a stateless, like the seizing of a stateless person's property is cognizable under international law? Thank you. I was going to get to it. I'll address it now. First, I should note Judge Leon did not reach that question. He stated in a footnote that he didn't need to reach it. But I think the law ought to be pretty clear on this. First, in Philip, the court said, quoting section 185 of the second restatement, which was the version of the restatement enforced at the time of the passage of the FSIA, that the taking of property violates international law when a state deprives an alien of property. The restatement goes on to say, in section 171, that an alien is any person who, quote, is not a national of the respondent state. And comment G to 171 says, quote, a stateless person comes within the definition of an alien for these purposes. So my first part of the answer is that, according to the restatement relied upon, or at least cited to by the court in Philip, a stateless person is an alien. A taking from an alien is a violation of international law. But if I may add to that, the restatement is simply a reflection of what international law provided at the time. As we cited in our brief, United Nations Convention on Statelessness from 1954 specifically affords stateless persons, quote, treatment as favorable as possible. And in any event, not less favorable than that accorded to aliens generally. So is your general view then that, I mean, typically with international law, the classic offense was by one state against another state. And it could be visited on a national of the other state. But usually there's an offense by one state against another state. And so you'd have a state to state conflict. And that would get worked out through diplomacy. And is your view that a stateless person should always be just considered for those purposes as if they were the citizen of another state? Some other state. We don't know which state because they're stateless. That they should be considered the citizen of some other state such that it gives rise to a cognizable offense under international law? I don't know that you have to accept that theory to conclude that a taking from a stateless person violates international law, which is to say you need to assume that a stateless person is, in effect, a foreign national. What I'm saying is that the law at the time said that the rights of a stateless person are as favorable as the rights of a foreign national, such that a taking from that stateless person, notwithstanding the body of law that Your Honor just referred to, violates international law. And I should add that while the court in Philip recited some of the history deriving from the law of nations and up through what we now call international law, for the proposition that traditionally the law of nations contemplated affronts by one nation against another nation. But if the court in Philip had concluded that a taking from a stateless person does not violate international law, it simply would have dismissed the case because the plaintiffs in Philip were Germans. They were born in Germany. They lived in Frankfurt. It would have been simple for the Supreme Court to say, in that circumstance, there is no violation of international law. Instead, it remanded with clear instructions to consider whether those individuals were nevertheless non-nationals, in other words, states. Can I ask you about the restatement third? Yes. I know that opposed states, but just in terms of the principles in the restatement third. So they define the taking that's actionable as a taking by the state of the property of a national of another state. Yes. Yes, I agree. That's what it says. But I cite you to what the Supreme Court said in Philip, which was that according to consistent Supreme Court practice, it refers for purposes of determining international law to the international law that was in effect in 1976 when the foreign sovereign immunity. So to the restatement third, you would be out of luck. I agree with that. If you follow what you just read, that's the case. And then there's the comment in 713 that specifically says that stateless people. I don't dispute that the restatement third differs in that respect from the second restatement. But as all I can say is the Supreme Court said you don't follow the third restatement. You follow the second restatement. And that's what it cited to in Philip. But is there a distinction that we need to make between whether the statelessness occurs by is your statelessness versus the factual statements? Yes. Thank you. I. We argue both. We say that Mr. Friedman was rendered de jure and de facto statelessness. I think we're right on both. But our stronger argument is on the jury wrong. And that is because there have been courts that have said if the court needs to sit at the motion to dismiss stage and must determine as a matter of fact, whether the violence done to the individual, the deprivation is done to the individual are so severe as to render him de facto a non-national or non-citizen. And we're sitting as a war tribunal. I think that's overstated. But our case doesn't call upon the court to consider any of that because Nazi Germany formally, unmistakably, legalistically rendered Mr. Friedman a non-citizen, a non-national and stateless. It did so in 1935 by the first degree issued pursuant to the right citizenship law, declaring that Jews are non-citizens of the right. Judge Collar Catelli observed the same proposition. But more to the point, and I want to emphasize the legalistic nature of this once again, Nazi Germany declared Mr. Friedman an enemy of the state. We attach that declaration as Exhibit D to the complaint. And it did so specifically to provide a legal fig leaf to steal all of his property. So regardless what the status of all German Jews was under German law at the time, I think it's clear that they were rendered non-citizens and non-nationals. Mr. Friedman certainly was rendered a non-citizen and non-national, and that happened prior to the looting of his property. And what international law of property are you professing? The international law of property is international takings law. And so the law, as the Supreme Court held in Philip, international law is that a taking from an alien, taking from an alien, at least according to the restatement without just compensation or without an adequate public purpose, violates international law. So we're citing emphatically the international law of property. And then when was this particular art taken? I don't know that you specifically allege a time period. We did. So the art was taken in 1941. And then there were securities that the family owned that were taken, I think, in stages, but we've alleged in the complaint, and we've attached, once again, exhibits to show this. Exhibits G and H and then K through L demonstrate that in 1943 and 1944, subsequent to the Reich Citizenship Law and the declaration that Mr. Friedman was an enemy of the state, securities were stolen. And I would like to mention, even though it doesn't go directly to the jurisdictional point, this is an extraordinary Nazi-looted art case. I realize there have been several before the court, because in this instance, we have contemporaneous inventory created by the Nazis of everything that was stolen. We have the orders back and forth from where Mr. Friedman lived to Berlin, ordering the confiscation of the material. We also have records demonstrating that the intent after looting the property was to sell it. We have documentation attached to the complaint that the purpose was to liquidate these stolen items and mix the proceeds with Germany's bank accounts, which goes to Your Honor, Judge Srinivasan's holding in Simon 1, that the commingling is sufficient to demonstrate the commercial nexus with commercial activity in the United States. Can I ask you about the bill of effect on Simon 1 and the Restatement 2nd, just to follow up on that, because we doubled the Restatement 3rd and we get back to the Restatement 2nd, which is operative for your purposes. So under Section 175 of the Restatement 2nd, it says that the responsibility of a state under international law for an injury to an alien cannot be invoked directly by the alien. And we'll just assume for these purposes that an alien includes a stateless person. Right. Against the state, except as provided by the law of the state, international agreement or agreement between the state and the alien. Yes. And your theory of qualifying under that is? Yes. And Judge Childs, I attended the argument on the Simon and Philip remand last month, and the same questions arose. The question under the Foreign Sovereign Immunities Act is whether the taking violated international law. And 175 in Comment D makes clear that it does. What you're raising are, as the restatement describes it, questions of standing to pursue the relief. And I think 175 is not the only place. I think it appears in 171 also, and it raises questions about how a stateless person would avail him or herself of legal redress for what it concedes is a violation of international law. That's irrelevant for present purposes. You just think the FSIA. We have the FSIA. The FSIA says, here's your venue to vindicate your rights, but we need a hook in international law. The restatement says there's a violation of international law. So the qualification, and Judge Pillard was pressing on this question last month as well, it's simply not a relevant point because we're proceeding under the Foreign Sovereign Immunities Act. Can I ask just about the role of genocide in your theory? Because that's come up in the district court opinions, including in this case. And as I understand your theory, it may be that the genocide is factually germane because it's what resulted under your allegations in statelessness. But you're not actually resting your theory on proving a genocide or on the international law consequences of a genocide. It's just factually what happened is because of the treatment of Jews, they were rendered stateless. Respectfully, not exactly. So we have two different theories. One is, and the one that I principally press here, is the de jure rendering of statelessness, which I won't say has nothing to do with the genocide because it is hard to imagine that the government would have enacted these laws but for the fact that it was persecuting the Jews. But to illustrate the distinction, suppose a more benign Nazi Germany had enacted laws to strip the Jews of citizenship but then didn't go about exterminating. It just treated them poorly. Under our de jure theory, the taking from any such Jewish individual would have been a violation of international law. We also say that there's been a de facto stripping of Mr. Friedman's citizenship because someone who's subject or a people that is subject to a genocide cannot be deemed citizens or nationals of the offending state. For that prong of our argument, we do rest on the genocide. And as I said earlier, I think that argument is right because all Philip said is we look to the international law of property, not the international law of human rights. And under the international law of property, unless you're a domestic, unless a victim is a domestic such that domestic takings rule shields the state from jurisdiction, you have a violation of international law. But I again, I can see that is a harder call in the wake of Philip. Our de jure theory is not under de facto theory. The violation of international law is what it is a taking from a stateless person. It is simply that that person has been rendered stateless de facto because of the genocide. You can write, but the violation of international law is not genocide. It's not. Under none of our theories, we read Philip. Under none of our theories is a violation of international law, the law of genocide or human rights. It is simply the distinction is how was our client or our client's forebear rendered stateless. That's the distinction. I see. If you could just, I mean, so one question really is whether a stateless person is more like a domestic national or more like an alien, I think, for the purposes of the domestic exception. And I'm not sure that the second restatement is entirely clear about that. I mean, if you can just point me to where you really think, you know, the taking a property from a stateless person. Is is contrary to international. I have a I have a textual answer and then I have a. But what I think is the logical reason why that is the case, the textual answer is that the second restatement says in so many words. That the taking by a state of property of an alien. Reading section 185 is wrongful under international law. And then the restatement second goes on to say. Section 171, a stateless person comes within the definition of. Well, it says it comes within the definition of alien in this section. Yes. Yes. Does that section include 185? I think it does. I don't I don't I don't understand any respect in which it would not. I think it does. But let me let me give the more. Logical answer that flows from Philip that I think provides color to this. Philip was concerned with the scope of the domestic take. The premise of which. Is explained in the Belmont case from 1937 that Philip cited you and it essentially says that. A citizen or a national of a particular state. If that person is harmed by the actions of that state. Should look to that state or redress. That that's the premise of the domestic. Take. It has also been explained pursuant to the rationale that that you mentioned, which is. That offense against your own national is not an offense against another state. But in this instance. There is no way to apply the domestic takings rule or the rationale of the domestic take. Because Mr. Friedman was not a domestic. He was stripped of his citizenship and of his nationality. And so what the question boils down to. Is if there's a taking in violation of international law and Germany is not. Doesn't have an escape. To jurisdiction under the FSIA because of the domestic takings rule. Then. His descendant has a right to pursue the claim under the foreign sovereign. If. Is there any space between being stripped of your citizenship and being stripped of your nationality? So, so Germany seems to argue that even if the citizenship. Was legally taken away that Mr. Friedman still remained a national. Of Germany. I mean, is there any space between those two things international law or otherwise the law in terms of case law and federal courts in the United States? And and also in international bodies is pretty thin. I will observe that the Supreme Court and Philip use the two terms interchangeably. It said that taking from a citizen is shielded by the domestic takings doctrine in other places. It used the word national. We've cited scholarship in our. In our opening brief, and I think more so in our reply brief. That scholars and historians agree that any distinction between those two terms is to use their words of vanishingly small and I have not seen an articulation. For purposes of the FSIA. Or the domestic takings rule. I, I understand Germany makes that argument, but I don't think there's a basis for that. And in any event. Our allegations, I think, are sufficient to show that he was stripped of both the strongest evidence of that. Is that he was declared an enemy of the state, the purpose of which was to denaturalize him so that Germany had a fig leaf to steal. The last thing I want to say, if I may, one more second. You know what I want me to say. If it's one second, it's up to you. We will give you a little bit of rebuttal time. Thank you, Your Honor. We urge that if you agree with us that Judge Leon was wrong. That you remand with instructions to deny the motion to dismiss because this extraordinary case was filed seven years ago. And the alternative grounds for affirmance that Germany raises all have now been thoroughly briefed. Judge Leon didn't reach them. But if the case is simply remanded on this issue, I fear that we will face years and years of additional district court litigation because of the state's right to an interim. Okay, thank you. Council, let's hear from Appalachian Council now. Mr. Dirks. Thank you for pronouncing my last name correctly. I have a lot of problems with that, as a lot of people do. So I'm not going to give you a highlight reel of my argument in our briefs. They've been thoroughly briefed by both sides. You've got a tremendous amount of information to work with. A main point here is what you're hearing is basically a repackaging of a failed genocide argument, trying to crowbar it into the law of takings post-bill. We've talked in our brief in pages 24 to 28 about the de jure, you know, denationalization or not. We covered the de facto in 29 to 33. I prefer not to rehash that and get into some more important things, which we've been talking about here and also in the Philip and in the Hungary cases two weeks ago. And that is, you know, if someone is stateless, let's spot them at the purposes of argument. What's the result? And when you're talking about a violation of international law, it would be useful to go back and think about what happened when the Helmholtz case got remanded to this circuit. And they were struggling with, you know, what's international law? And by and by, along in the brief, they say a plaintiff has an obligation to prove that in fact, you know, whatever the exception they're relying on has crystallized into an international norm that bears a heft of international law. And also talking about ambiguity, if it's ambiguous or uncertain, it's not there. It's got to be pretty darn clear. And I think that the fact that we're having this extended discussion about what happens if someone's stateless tells you that perhaps it's not as clear as the. No, I mean, I think every time there's litigation in a case, people have arguments about what the law is. What is the answer? What is the state of international law at the relevant time about whether stateless persons are covered by can I just finish are covered by the prohibition against expropriations? Because they're either if they're if they're more like citizens of the state that perpetrated the taking, they're not covered. If they're more like persons who are citizen of another state, they are a citizen or national another state. They are covered. And we've heard argument on why under the restatement second, which is the one that is from the relevant time frame, we should consider them to be covered. But you, you obviously disagree. I obviously disagree. And I think that the point has been made that the second restatement is perhaps not as clear as the public would like it to be. If you look at the third restatement, one of the things the third restatement says with regard to. I think I think counsel, unless you're going to tell us something different. I think counsel on the other side already agrees that under the third restatement, there's no claim. Well, except that there's something there's a comment. There's a comment here that the in section 713 of the third restatement, it says. That the third restatement is section 711 and 712, which are where the rubber meets the road. The principles of those sections provide no protection to a stateless person. But then if you look at the in 712, it says that they were really restating restating the traditional rules of international law of expropriation of alien properties and take essentially the same substantive positions as the previous restatement. So the third restatements statements are saying, hey, we haven't changed the thing. We're just telling you what the second restatement says. Well, let's just focus on the text of the second restatement, though. I mean, what the what the third restatement interprets the second restatement to say isn't necessary. So so how would you distinguish the arguments about the second restatement itself just on the text of the second restatement? I don't think the second restatement supports their position. And I think the third restatements. Well, why? Why does the second restatement support that? It doesn't it doesn't the whole principle, if you go back to what with the Philip case talked about, the whole principle of the law of expropriation of international law is that the taking of an injury to the aliens nation of sovereignty. It's the injury isn't to the individual, it is to the individual sovereign. Well, but the second restatement says that a stateless person comes within the definition of alien. So so let's focus on the text of the second restatement. And why do you think that doesn't cover the argument that was made by your friends on the other side? I think the nicest thing you can say about it is it's ambiguous. What's what's ambiguous? It's ambiguous in terms of you have to put it in the context of the international law that at the time, and even through the third restatement, where the injury is to the alien sovereign. We're talking about international law. We're not talking about the law of, you know, of individuals having rights. We're talking about nations having rights. I understand the conceptual distinction and the traditional understanding of international law. But but I'm interested in this language in Section 171 of the second restatement. Well, it says alien, but it doesn't say what that means in the context of other parts of the restatement. And what you see in the third restatement is where they lay it out for you and say, we're laying out for you here in the third restatement is what the second restatement says. We don't we're not changing a thing in this in this area of the international law. So your theory, it has to be if we don't just let's let's just for argument purposes. I know you're resisting it, but let's just say we're not going to consider the third restatement. Let's just take it out of our minds for just under the second restatement alone. Your theory is that even though the second restatement defines alien to include a stateless person in 171, we shouldn't assume that that definition governs in 185. Correct. I think that's a nice thing to say. It's ambiguous. And if you go back to what, because if it does govern, if 171, would you agree that if 171's definition does govern for 175, then on this theory, you lose. Well, I think in the broader context of the international law of expropriation, which was explained in Philip, is the theory is that it's the injury to the alien state. A stateless person doesn't have the injury. Philip leaves open the question of whether a stateless person is more like an alien or like a domestic citizen or national. That's why they remanded that question in Philip. So it says nothing one way or the other about, you know, which way a state, how a stateless person should be conceptualized in this framework. That's correct. And that's my point. If you go to what this court said in the remand and helmet, it says, if a plaintiff is asserting a violation of international law, it has to be not ambiguous. It has to be certain. And you get down to, also said, it has to demonstrate that in fact, it is crystallized into an international norm that bears the hat of international law. There's only one United States case that I'm aware of that dealt directly with that. We cited an 11th Circuit case that said, you know, stateless person, you know, can't do it. There's a difference between arguing that the appellants here have failed to demonstrate this is covered by international law and arguing that a stateless person is not covered by the international law of expropriation. I mean, those are two distinct arguments. One is that they failed in their burden of proof. And the other is that international law forecloses a stateless person from relying on this law of expropriation. I mean, those are those are distinct arguments. I understand it. But I think the burden is on the plaintiff to show that is in fact covered. And once again, going back to Helmreich on remand, that's what this court said. If it's ambiguous, the plaintiff said a lot. It has to be crystallized into an international norm. In fact, that we've had this discussion here, and there was discussion in the case and in the Hungary cases that Judge Shiles was at. The fact that we're having this extended discussion tells you everything you need to know about whether this is crystallized into an international norm, and it's not ambiguous. So I think that's, that's the problem. I'd like to move on and talk about. Do you agree on the first part about de jure statelessness? Do you agree on de jure statelessness? And then you just. No, as I said, 24 to 28, we demonstrate that no matter how shadowy and reprehensible the conduct was, it didn't rise to the level of depriving him of his de jure nationality as German. What about depriving them of citizenship? Do you deny that that Mr. Friedman was stripped of his citizenship? He was stripped of a lot of rights. Okay. There are a lot of cases where people, for want of a better word, are second class citizens. I think the thing is that the international law uses the term national. And I think they use the term national because what I didn't realize was until after World War II, citizens of the United Kingdom were not citizens of the United Kingdom. They were subjects of the crown. So in a lot of places, you know, you could be a national. Everybody understands national, more or less. But citizenship wanders all over the place. And I think that's why the restatement talks in terms of national. Because citizenship gets you into murky territory that wanders around all over the place where nationality is more of sort of the international norm. So a person, though, who is stripped of their citizenship by law, I think it seems like Germany's view of that is, although it seems that by law they were stripped of their citizenship, they somehow, Mr. Friedman remained a national of the German state. Is that your argument? No, I think we're saying that he, as reprehensible as the treatment was, it did not rise to the level where he was no longer a citizen and no longer a national. He didn't have the same level of rights as some other Germans did, but that didn't mean he was no longer a German citizen or a German national. He just didn't have the same rights. He didn't have any rights after those laws were enacted? And he was declared an enemy of the state? I mean, I'm not sure how a declaration that someone is the enemy of the state could be consistent with the idea that they remain a citizen and a national of that state. Well, obviously, I think we disagree with you on that. I think our brief goes over this in great detail. I'd like to move on to some other things if it's possible. There are other problems with the case here that I think need to be, can't get lost in the shuffle. And that is when we talk in Helmreich about how, in Helmreich, the standard really changed to how you're supposed to review these things. You know, they're relying on a plausibility standard. And I think that, you know. This is on the commercial. This is, is that where you're going to now? Correct. Yeah. And so the district court can get into any of this, right? That's correct. But I think that these are all alternative grounds, and I think we need to. Yeah, we, I just want to see if my colleagues are interested in this, because I think we're focused on the parts of the argument that we've been talking about so far. And on that, I just want to make sure I understand your theory. So 171 says a stateless person comes within the definition of alien in this section. But responsibility for injury too, and then goes on and says what it says about 175. And if we, I know that part of your argument is you have to consider the entirety of the second restatement against the backdrop of international law, which, which deals in the realm of state to state disagreements. Correct. Which, which Phillips talks about. Yeah. Yes, Phillips does. Let's just suppose, I'm just trying to understand under the terms of the second restatement itself. Let's just assume the second restatement is a statute, and I'm just trying to understand this statute. I know it's not, but let's just pretend that it is. What's your argument that under the terms of the restatement, the theory that the appellant has put forth doesn't work under the terms of the second restatement? Because it just seems like a mathematical equation. The takings prohibition speaks in terms of an action against an alien, and then the restatement defines an alien to include a stateless person. Ergo, it works. I think once again, you have to put it into the context. So your argument relies on the context, which is a perfectly fair argument. I just want to make sure that I understood. You don't have something under the terms of the restatement. Okay, I understand. Let me ask if my colleagues have any additional questions for you. Okay. Okay. Thank you for your argument. You understood my alternative arguments? What's that? I wanted to discuss the alternative. Yes, and we have those from your briefs. We do. We do. We've taken stock of those. I mean, if you want to take, I will give you one minute to do your alternate argument if you'd like. But let's keep it at that because we're focused on the question that we've been asking for. Something that was admitted in the reply brief is important here. What Mr. Torrence's counsel said was that basically their allegations with regard to commingling are basically a mirror of what the allegations were in assignment. And because it worked in assignment, it ought to work here. But putting aside the plausibility issue, which we briefed, and which the Second Circuit adopted in Recuro, the context of assignment was where Hungary did not contest the allegations. All the court had before it was allegations and arguments by the government of Hungary. We didn't do that here. We put in historical facts which demonstrate clearly that there is no plausible way that cash from 1942 could wind up in the United States in the 21st century as German property. And the most important of which is that there was no German government for four and a half years. Germany was controlled by the four occupying powers for an entire period. So even if something managed to survive until May of 1945, to suggest that somehow or other, even though Germany didn't exist for four and a half years, it wound up in the German treasury in the 21st century, this is impossible. Thank you, counsel. Appreciate your argument. Mr. Orsik, we'll give you two minutes for rebuttal. Thank you, Your Honor. I'd like to briefly come back to your question about section 171 of the restatement. What you quoted to me was comment G, which says that a stateless person comes within the definition of alien in this section. That does refer to 171 in this section, but if you look at the text of 171, the rule says a person is an alien for purposes of the responsibility of a state or injury to an alien. So that right there demonstrates that for purposes of 185, which is a question of the responsibility of a state or injury to an alien, because that's what it says. That's how I get from the comment in 171 G to 185. You can't ignore the text of 171. Well, 171 is just a definition section. So it's, I mean, of course it applies, because it's just defining what the term is. And to say that it's for purposes of this section, it would be pretty tautological to say it's a definition of a definition for purposes of a definition, but nowhere else. No, I agree. I'm saying it less artfully. My point is that 185 is the section I rely upon, and 185 must incorporate the definition of an alien. 171 is the definition of an alien, and 185 says a taking from an alien is a violation of international law. Does that mean a stateless person is an alien throughout the restatement, because it's in the general law? I think so. I haven't tried to do a study to determine whether there's a respect in which it can't be. But 171 says for purposes of the responsibility of the state, so at least for 185, it must. Because 185 states are responsibility of the state. Correct. Correct. I would like to add, the declaration of Mr. Friedman being an enemy of the state is in the Joint Appendix at page 95, JA 95, where the Gestapo makes that declaration, and we have cited law in our brief that says that the purpose of that declaration is to denaturalize an individual and thereby, under Nazi law, be able to steal his property. So I take issue with counsel's suggestion that we haven't demonstrated that the enemy of the state declaration was sufficient to deprive him of nationality. The last thing I'll say, and I realize you don't want to get much into the alternative argument, but this notion that the Helmreich case undermines and changes the burden of production we must make at the jurisdictional stage has been exactly that same argument has been rejected by three different post-Helmreich decisions by this court, Lambia, Shubarth, and EIC. And I'm happy to rest on our brief as to why the allegations we made of commingling are sufficient to allege the necessary doing commercial activity in the United States. I don't have anything to add to what we've seen. Okay. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Rao, Childs